## SARAH E. COLES
### *v.*
## RANDOLPH W. COLES.

A wife's conduct, induced mainly by the fact that she was unwilling to live with her mother-in-law, was exasperating and unforgiving, provoking her husband even to violence in a single instance and under

36

peculiar circumstances, and exhibits an entire disregard as to his wishes about his household affairs, and a determination not to do her duty therein,—*Held*, that although it presents no justification for such violence, yet it is not sufficient ground to sustain a divorce for cruelty.

Bill for divorce *a mensa et thoro.* On final hearing on pleadings and proofs.

*Mr. J. R. English,* for complainant.

*Mr. J. B. Coward* and *Mr. W. J. Magie,* for defendant.

The Chancellor.

The bill is filed for a divorce from bed and board, on the ground of extreme cruelty. The parties were married in June, 1871. They had one child, which was born July 29th, 1875, but died in a few days. When the testimony was taken, the complainant was twenty-nine years old, and the defendant forty-six. At the time of the marriage, the defendant was living on a farm near Plainfield, of which an undivided half was owned by his father and the other half by him and his sister; and the defendant and his father and mother and sister were living there together, as one family, in the farm-house on the property, the mother and sister being the housekeepers.

The complainant, immediately after the marriage, went to live with her husband. She continued to live there until April 15th, 1874, when she left him, because, as she alleges, of his cruel treatment of her. For about three years from the time of the marriage, matters went on smoothly in the household, the women doing the housework together. During all that time, the complainant says the defendant treated her well (" nicely," as she expresses it), but she says that, from the fall of 1874, he treated her very unkindly. She complains that he permitted his father, mother and sister to insult, abuse and strike her, and that he struck her himself on several occasions; that he refused to supply her

Coles *v.* Coles.

wants of food and clothing, withdrew himself from her bed and refused to return to it, and persistently refused to talk to her or reply to her when she addressed him.

It appears clearly, from the evidence, that the conduct of her husband and the other members of the family towards her, of which she complains, was due, to a great degree at least, to her determination not to do any work whatever in the household, to her neglect of her husband, who was somewhat of an invalid, and to her disposition to annoy all of the family, especially her mother-in-law and sister-in-law. She seems to have been dissatisfied with the family arrangements and to have been very desirous that her husband should leave the house in which they were living, to his father, mother and sister, and occupy, with her alone, another house, a new one, standing on the same property and which was unoccupied. This, from considerations of economy (and, perhaps, from other considerations, also), he appears to have been unwilling to do.

The testimony shows a deliberate design, on her part, to annoy the family by way of retaliation, and it abundantly appears that very much of the treatment of which she complains was occasioned and provoked by her own conduct. She exhibited no spirit of conciliation, nor any disposition to make any sacrifice or even concession for the sake of harmony, but, on the other hand, seems to have prided herself in her ability to assert her rights as she understood them, and to defend herself against all assaults of whatever character. She retaliated to the extent of her ability, and, with much ingenuity and great success. Much of her conduct may have been excusable in view of the annoyances suffered by her, but there seems to be no room to doubt that she exhibited a resentful and belligerent spirit, and sought redress for grievances in the compensation of full retaliation. She complains that her mother-in-law, on one occasion, threw some water upon her (it seems to have been but a small quantity), but it appears that it was in the course of a strife between them, in which the complainant had endeavored to

wrest some newspapers, which had come by the mail, addressed to her husband, out of her mother-in-law's hands.

The complaint that her sister-in-law struck her, is flatly denied, and her testimony on the subject is in nowise corroborated. As to the violence which she says she suffered at the hands of her father-in-law and mother-in-law, it appears to have been but slight at most, and to have been provoked by her own violence or misconduct towards them, as is seen in the account given by the defendant, and which is corroborated in all essential points by the complainant's testimony on the subject of the transaction, in which the complainant says defendant's father struck her. It is as follows: "I was sitting in the dining-room, on one side of the stove, and my father on the other; he always brought in a scuttle of coal at night, and set it down in that room for morning; she had been away for some time; when she came home, she came in that room, took hold of this scuttle of coal to take it out; my father took hold of the scuttle and told her she could not have that, there being another scuttle, she could get it herself, the coal being nearer than that was; she said she would have it; he kept hold of it; she took hold of the bottom of the scuttle, tipped it upside down, all over the carpet; told him that if he wanted the coal he could have it; he told her to leave the room; she would not; he opened the door, took her by the arm or went to take her; she gave him a violent push, pushed him down against the sideboard on the floor; it was some time before he could get up, having the rheumatism; he never struck her; he went to gathering up the coal after getting up; she sat down in the room and laughed at him."

Of the occasions on which she says her husband used violence towards her, the proof establishes but one. In the struggle in which she says her husband tore out her earring, it seems very doubtful at least whether he struck her at all. Having narrated the occurrence which took place on the day she left the defendant's house and in which he choked her, she was asked, " Can you give any other

Coles v. Coles.

instances of personal violence suffered from your husband?"
She replied, " He had attempted that before; he did not do
it so violently." She was then asked, " What was it before
that he did?" She answered, "It was May 2d, 1876, he
struck—well, he didn't—he struck me and tore one of the
ear-rings from my ear, and sort of strangled me."

The husband's account of the transaction is as follows:
" I recollect her coming into the room where I was sitting,
and using some language that I did not like to hear; I told
her that if she could not use better language, she must leave
the room; she said she would leave it when she got good
and ready; I got up and opened the door, and took her by
the arm and led her out; when I was standing in the door,
she gave me a push violently, and threw me down; I might
have caught hold of her; I did, I suppose; I recollect her
missing one of her ear-rings, or looking for it at the time,
but whether I tore it out or not, I cannot tell." He adds,
that he used no more violence than such as seemed neces-
sary to remove her from the room.

On the day on which she says she left the house, never to
return again, her husband pushed her or threw her on the
floor and choked her, but he appears to have acted in a
transport of passion, caused by her conduct in deliberately
and wantonly overturning a panful of milk, so that the milk
ran on the floor. His sister tells the story as follows, and
her statement is corroborated by the testimony of the com-
plainant herself: " She took a small pitcher and went out
to the barn to get some milk, I suppose; after she came out
of the cow-yard, where the cows are kept, she went into the
carriage-house; she was in there some time; I went out to
see if she was not taking the nuts off the carriage, because
she had taken nuts off before that, and we never saw them
afterward; she was trying to get the shafts out of the car-
riage, to get the bolts out of the shafts; I told her to let the
carriage be, not to take the shafts out; she said she meant
to raise the devil; she ran the carriage out of the carriage-
house; my mother came out and I went into the house;

Coles v. Coles.

in a little while Mrs. Randolph Coles came into the house and went to the closet; she tried to break the closet open; she took hold of the knob with her hand, and tried to pull the door open, jerked it violently; I told her not to break it open; she said she would break every lock in the house; I tried to push her away from the cupboard or closet; she said that I struck her; I said I did not strike her, she knew very well I did not; then she said I had laid my hand on her, and that was enough; she pulled the door open; the lock was not very strong and she burst it open; there was a pan of milk in the closet; she tipped up the pan of milk in the closet, so that the milk ran all over the closet and ran out on the carpet; I went up-stairs and told my father to get up; he came down and told her to leave the room; she said she would not do it; she was quarreling so loud that people could have heard her in the street; I told my brother (the defendant) to get up; when he came down she was still quarreling; he took her by the shoulder and pushed her out in the kitchen; he said she would have to behave if she stayed in that house; he pushed her through the kitchen into the sitting-room; I saw them afterwards; he had his hand on her throat; after he let go, she sprang up immediately, and said she had got him now just where she wanted him; he had laid his hand on her and that was all she wanted, and she would make him pay well for it; she prepared her breakfast as usual; she laughed two or three times, and said she guessed we would have to put our hand in our pocket-book now; after she had eaten her breakfast she went to church, I suppose; she left the house; we did not see her again until Monday, some time in the forenoon; this happened on Sunday morning; on Monday she came to the house with a paper, said she would read it; I did not hear her read it; after she had read the paper, she left again; the Saturday of the same week, or the Saturday of the week following, I forget which, she came back and stayed until Monday; she did come back to stay any time after that, not while I was there."

Coles v. Coles.

It appears, from this statement, that the complainant, to say the least of it, was not without blame in the transaction. She subsequently returned to the house and read to the defendant a paper, referred to in the testimony just quoted, prepared by her counsel, by which she demanded that the defendant should perform his obligations to " treat her with courtesy, and to feed, clothe, protect and sleep with her," to which the defendant made no answer.

The complainant's conduct in the fall of 1875 illustrates her methods. The defendant's sister gives the following account of it : " The occasion of the coldness that existed between us in the fall of 1875, was about the milk or milk-ing ; because we would not give her all the milk she wanted, she would throw the milk all over the kitchen, on the floor and stove and tables ; she did that twice ; we had to take the carpet up ; my mother and I sometimes milked in the field ; when we went out to milk, my sister-in-law would take a stick and drive the cows around the field, to prevent us from milking ; when we opened the gate to drive the cows into the cow-yard, she would run ahead of the cows and shut the gate again ; she said it was glorious fun, and there was nothing like a little exercise." The witness adds : " The reason we would not give her all the milk she wanted, was because she wanted half or more than half, and she would take it away and sell it ; it was in the spring of 1876 that I ceased to be friendly with her ; the reason was that she ceased to do any work, and that we were obliged to support her." The same witness swears that the family always treated the complainant well, so long as she treated them well. She says : " When she helped do the work, and spoke to us kindly and treated us kindly, we always treated her kindly ; my brother has had asthma for the last three years ; he has been around the house and so that he could go out ; this has been for the last two or three years ; complainant has got a very violent temper ; Randolph has not ; he is very mild, seldom see him angry ; my mother is a little irritable, a little violent sometimes, but I think the

complainant is the most violent; my father is very seldom angry; my temper is not very violent, I am like Randolph; Randolph was very kind to her, never unkind to her that I know of; he always used her well; the most times that she treated him badly he would not say anything about it, he would put up with it; sometimes he would speak about it to her."

The defendant, speaking on the subject of his conduct toward the complainant, says: "For the first two or three years of our married life, when she did conduct herself properly as a wife should, things were pleasant and agreeable enough; but when she got to going away and running me in debt, and neglecting to take care of me when I was sick, not only neglecting to take care of me, but aggravating me in different ways, as a matter of course, it made my folks feel unpleasant toward her, and myself not feel so pleasant toward her. I will venture to say that not one man in a hundred has done more toward a wife than I; if I have not been a kind husband and a generous friend, let her mother be brought to testify." He very properly admits that his conduct was not always irreproachable.

Daniel J. Marshall, a friend of the complainant, and with whom she consulted for some time after her marriage, and at whose house she visited up to and after the time when she left her husband, says that in none of the conversations which he had with her, did she ever say a word against her husband, but only complained that he did not take her to the new house. And though he visited the defendant's house while the complainant was living there, he says he never saw an unkind action on the part of the defendant towards the complainant, and never heard the least complaint on the part of the former. He adds that he never saw the defendant show anger towards the complainant, and that he always appeared to be pleasant and kind. He says that he was there four or five times after the birth of the child, and before the complainant left; that he would sometimes go and spend an hour or two, and sometimes stay to tea.

Mr. Marshall appears to have been the adviser of both parties, the mother-in-law as well as the daughter-in-law. He says that, after the birth of her child (which, as before stated, took place July 24th, 1875), the complainant did not speak very much to him about her troubles, but before that she had conversations with him on the subject, the first being about two years after the marriage; that her first complaint was that the defendant had not done as he promised when he married her, that he had not taken her to the new house. In that conversation, she said if he had not made that promise she would not have married him, and she expressed her determination to do no work until he should have taken her to that house, and added that when there she could work as well as anybody. In the conversation which he had with her, Mr. Marshall advised her to go to work, but at first she refused, giving as a reason her disapproval of her mother-in-law's manner of doing the housework. In these conversations, she complained only of her mother-in-law. She said her husband was kind, that no better man or better husband ever lived than he; that she had not a word of fault to find with her father-in-law, that there could be no better man than he, and she expressed her satisfaction with the conduct of her sister-in-law.

Mr. Marshall, in one of the conversations, referred to the fact that he had been told that she was away from her house a good deal, and cautioned her on that head, to which she replied by declaring that she knew enough to go back often enough to keep her place, "as her right," or as his wife (he says he is not sure which expression she used), and that she had had advice or counsel and was "posted," and knew enough to hold her right there. He says that she said, "Out or in, I don't care; I will raise the 'Old Harry' with them all, if Ranny (her husband) don't take me up to the new house." Mr. Marshall says that he then said that she had better be quiet; that the defendant had told him that his circumstances were not such as to permit him to support two houses, and she replied that her circumstances

would permit it, and that she would raise the ' Old Harry ' if he did not take her to the new house to live, and this, he says, she repeated several times. These conversations she had with him up to within three or four or five months of the time when the child was born. He says that, three or four months before the child was born, she came to him for advice as to how best to get along with the family, especially her mother-in-law; that he advised her to go to work, and that she then left him, and, subsequently, when he next saw her, he asked her how she got along, and she said " Very well;" and he asked her if she had gone to work, and she said " Yes."

John C. Meeker, a neighbor of the parties, testifies that he had conversations with the complainant, up to about the fall of 1875, in regard to her family difficulties, and that, in these, she said that she could not get along very well with her mother-in-law, and would like to have her husband move to the new house. He says she always spoke highly of her husband and the rest of the family, except her mother-in-law; that he has heard his wife tell the complainant that if she would go home and go to work, she would get along better, and that he has told her so himself, and that she, in reply, declared that she would not go to work where her mother-in-law was. He adds that she never, to his recollection, in any of these conversations, complained of any ill-treatment from her husband or from any one of the family.

It appears, by the defendant's testimony, that when he left her bed, she told him he need not think he was necessary for her pleasure or her comfort, for he was not; that she subsequently requested him to return, and he did so, but left again, in March, 1876, and she then, as he swears, said she was glad he left her room.

That the complainant's situation in the household was very unpleasant to her, cannot be doubted. It is evident that she was very unwilling to live with her mother-in-law. She appears to have been subjected to many annoyances,

and her husband confessedly laid violent hands upon her. He may have been penurious in his dealings with her. Had her own conduct been different from what it was, had she herself been free from blame, I would not hesitate to pronounce the desired decree for divorce. But I cannot shut my eyes to the fact that her conduct has been unforgiving and unforbearing, calculated to exasperate rather than conciliate; that she seems to have been unwilling to conform to her husband's wishes in regard to his household affairs, and to discharge her duties under the circumstances in which she was placed.

The defendant's conduct, in laying violent hands on his wife, is not justified. It is not capable of justification. But the question to be determined is, whether there is reason to apprehend that, if the complainant shall return to his house, she will be in danger of violence or cruelty at his hands. I do not think she will. But if, on her return, he shall again treat her with violence, this court will be open to her for relief. The bill will be dismissed, but without prejudice, as in *English* v. *English, 12 C. E. Gr. 579.*